# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

1. BRITTANY ALLEN and
2. CHASE ALLEN, Individually
   and as Parents and Next of Kin
   of KAMBRY ALLEN, a
   Deceased Minor,

    Plaintiffs,

v.

1. CLINTON HMA, LLC, d/b/a
   ALLIANCEHEALTH
   CLINTON;
2. MICHAEL C. HENSLEY, M.D.;
3. CLINTON HMPN, LLC, d/b/a
   ALLIANCEHEALTH
   MEDICAL GROUP WOMEN'S
   HEALTH CLINTON;
4. STACEY D. KNAPP, D.O.; and
5. VICTOR L. FEY, M.D.,

    Defendants.

Case No. CIV-19-527-HE

---

## Complaint

---

 Plaintiffs, Brittany Allen and Chase Allen, for their causes of action against Defendants, Clinton HMA, LLC, d/b/a AllianceHealth Clinton; Michael C. Hensley, M.D.; Clinton HMPN, LLC, d/b/a AllianceHealth Medical Group Women's Health Clinton (Women's Health Clinton); Stacey D. Knapp, D.O.; and Victor L. Fey, M.D., allege and state as follows:

## Introduction

1.      This case arises from the tragic and unnecessary death of Brittany and Chase Allen's baby girl, Kambry.

2.      Kambry Allen was a special child. After years of unsuccessfully trying to conceive naturally and with the assistance of other fertility treatments, the Allens had only one option left: in-vitro fertilization (IVF). But IVF was beyond their means, and the Allens faced the very real prospect of not being able to have a child.

3.      Then something incredible happened. On the drive home from a business trip to Dallas, Brittany stopped at WinStar Casino and hit a slot-machine jackpot, winning almost enough to pay for a single IVF cycle.

4.      After Brittany's fertility specialists in Oklahoma City confirmed that the IVF was successful, Brittany returned to the care of Dr. Hensley, her OB/GYN in Clinton.

5.      Kambry was born at AllianceHealth Clinton on the afternoon of June 9, 2017. She died later that night as a result of avoidable medical errors.

6.      Dr. Hensley delivered Kambry via cesarean section (C-section). Although Dr. Hensley would later tell the Allens that the delivery was not particularly difficult, he took the dangerous and extremely unusual

approach of using both a vacuum extractor and forceps to deliver Kambry's head. The trauma to Kambry's head caused a profound subgaleal bleed.

7.      Despite the fact that Kambry was in obvious distress from the moment of birth, no physician performed a meaningful examination on her until almost an hour and a half later. Kambry spent the first 80 minutes of life under the care of a licensed practical nurse, with minimal or no assistance from the supervising registered nurse.

8.      When Kambry's "pediatrician," Dr. Fey, finally examined her, he observed that she was severely anemic and determined that she was displaying sufficiently concerning clinical signs to warrant a transfer to the OU Children's Hospital in Oklahoma City. Dr. Fey called OU and arranged for Kambry to be transported by helicopter.

9.      Before the OU NeoFlight team arrived to transport Kambry, Dr. Fey left the hospital for nonemergency personal reasons. Dr. Fey did not provide necessary and available stabilizing treatment—a transfusion. Instead, he abandoned Kambry in critical and unstable condition. This conduct was consistent with Dr. Fey's history of dumping neonatal patients on OU transport teams and relying on the transport nurses to stabilize the patients.

10.     After the OU NeoFlight nurses arrived, they did everything they could for Kambry. Unfortunately, because Kambry did not receive

appropriate care earlier, her condition deteriorated to the point where she could only be kept alive by machines and only for a limited time. Rather than subject Kambry to that fate, the Allens chose to hold her while she took her last breaths.

11.     The Allens bring claims against AllianceHealth Clinton under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, for failure to examine and stabilize Kambry.

12.     The Allens also bring a wrongful-death claim against all Defendants under Oklahoma law.

## Parties, Jurisdiction, and Venue

13.     Plaintiff Brittany Allen is the mother of Kambry Allen, Deceased, and wife of Chase Allen.

14.     Plaintiff Chase Allen is the father of Kambry Allen, Deceased, and husband of Brittany Allen.

15.     The Allens reside in Crawford, Oklahoma.  Chase works on his family's farm. Brittany owns and operates the Twisted Pearl Salon in Cheyenne, Oklahoma.

16.     Defendant AllianceHealth Clinton is a general acute-care hospital located in Clinton, Oklahoma. AllianceHealth Clinton is owned and operated by Community Health Systems, Inc. (CHS), or subsidiaries or

affiliates of CHS. CHS is one of the largest hospital organizations in the United States and is headquartered in Franklin, Tennessee.

17.    Defendant Hensley is a medical doctor licensed by the State of Oklahoma and board certified in obstetrics and gynecology.

18.    Defendant Women's Health Clinton was Dr. Hensley's employer at all times relevant to this action. Women's Health Clinton is part of AllianceHealth Medical Group, a large network of physician practices across Oklahoma. Women's Health Clinton is owned and operated by CHS or subsidiaries or affiliates of CHS.

19.    Defendant Knapp is a doctor of osteopathy licensed by the State of Oklahoma and board certified in family medicine.

20.    Defendant Fey is a medical doctor licensed by the State of Oklahoma and board certified in family medicine.

21.    This Court has original jurisdiction over the Allens' EMTALA claims under 28 U.S.C. § 1331 because those claims arise under a federal statute.

22.    This Court has supplemental jurisdiction over Plaintiffs' state-law wrongful-death claim under 28 U.S.C. § 1367(a) because that claim arises from the same core of operative facts, and thus forms part of the same case or controversy, as Plaintiffs' EMTALA claims.

23.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in the Western District of Oklahoma and a substantial part of the events or omissions giving rise to the Allens' claims occurred in the Western District of Oklahoma.

## Statement of Facts

24.    Kambry was conceived via IVF in the fall of 2016.

25.    Before Kambry's birth, Brittany and Chase selected Dr. Fey to be Kambry's primary-care physician.

26.    Dr. Fey and AllianceHealth Clinton held Dr. Fey out to the public as a specialist in pediatrics.

27.    The Allens believed that Dr. Fey was a "pediatrician."

28.    Dr. Hensley managed Brittany's prenatal care.

29.    Neither Dr. Hensley nor any other healthcare provider had any concerns about the health of Kambry during Brittany's pregnancy. All tests and other indications were that Kambry was completely normal.

30.    Brittany's pregnancy was unremarkable until near the end, when she experienced severe gestational hypertension.

31.    On June 1, 2017, when Brittany came to AllianceHealth Clinton for a fetal nonstress test at 38 weeks and 5 days of pregnancy, she

had elevated blood pressures of 153/70 and 161/73. Dr. Hensley discharged her home.

32.     On June 3, 2017, when Brittany returned to AllianceHealth Clinton experiencing cramping and back pain at 39 weeks of pregnancy, she had elevated blood pressures of 192/83 and 173/81. Dr. Hensley again discharged her home.

33.     Dr. Hensley scheduled Brittany for an induction at AllianceHealth Clinton on June 5, 2017, because of her gestational hypertension.

34.     The induction failed, and Dr. Hensley discharged Brittany home on June 6, 2017.

35.     Although the Allens inquired about proceeding with a C-section at that time, Dr. Hensley told them that it was not medically necessary, that it would be hard to get insurance to pay for it, and that he did not want to increase his 11% C-section rate.

36.     On the morning of June 9, 2017, during a prenatal appointment at Dr. Hensley's office, Dr. Hensley determined that he should perform a C-section that afternoon because Kambry was between eight and nine pounds, and Brittany's cervix was not sufficiently dilated.

37.     Dr. Hensley started the operation at 3:18 p.m.

38.    During the procedure, Dr. Hensley first attempted to deliver Kambry's head using a Kiwi vacuum extractor.

39.    When he was unable to deliver Kambry's head with the vacuum extractor, Dr. Hensley switched to Simpson forceps, which he successfully used to deliver Kambry's head.

40.    Kambry suffered extensive subgaleal hemorrhages in different regions of her head as a result of Dr. Hensley's instrument use.

41.    Dr. Hensley completed the delivery at 3:29 p.m.

42.    Kambry weighed 8 lbs. 1 oz. at birth.

43.    Kambry displayed signs of anemia and hypovolemia beginning at the time of birth.

44.    Kambry looked "shocky" at the moment of birth. She was "extremely pale" and hypotonic.

45.    Immediately after birth, Kambry became tachycardic. Her heart rate increased from a baseline of 145 beats per minute in utero to 170–190 beats per minute after delivery.

46.    Kambry exhibited diminished responsiveness and lethargy.

47.    Kambry also had a prolonged capillary refill time.

48.    Kambry's APGAR scores were 2, 4, and 6 at 1, 5, and 10 minutes, respectively.

49.    Jeanine Calloway, L.P.N., received Kambry in the delivery room and attempted to resuscitate Kambry with blow-by oxygen.

50.    It was obvious to Nurse Calloway that Kambry was a very sick baby. Nurse Calloway requested assistance from other staff in the delivery room, but everyone was either occupied or otherwise unavailable to help.

51.    No physician examined Kambry in the delivery room.

52.    Although Dr. Hensley's operative note states that "[b]lood was drawn from the cord for routine newborn labs," the labs were never done.

53.    Nurse Calloway took Kambry to the newborn nursery at 3:44 p.m.

54.    A nursing note entered by the supervising nurse responsible for Kambry's care, Kaylene Rivera, R.N., states that Dr. Knapp was in the nursery rounding on other patients and "assessed" Kambry at that time.

55.    Dr. Knapp did not create a note, order any tests, or otherwise document any findings or plan of care. The only documentation of Dr. Knapp's examination of Kambry is the aforementioned note by Nurse Rivera.

56.    Nurse Rivera was overrun on the floor and was rarely in the nursery. As a result, Nurse Calloway had to care for Kambry by herself. Nurse Calloway told Nurse Rivera several times that she needed help with Kambry and asked for any anyone available to help.

57.     At 4:00 p.m., Nurse Calloway called Dr. Fey, informed him of Kambry's status, and told him that she needed him in the nursery now.

58.     Dr. Fey stated that he would round soon.

59.     Dr. Fey's office is in the same building as the hospital.

60.     Also around 4:00 p.m., Brittany's mother arrived at the hospital and saw Kambry in the nursery.

61.     Dr. Hensley was sitting at the nurses' station that was next to the nursery. Dr. Hensley told Brittany's mother that they were going to leave Kambry in the nursery because she was not moving around very much and she was very pale.

62.     Brittany's mother informed Dr. Hensley that the family was not opposed to Kambry's being transferred to another facility for a higher level of care.

63.     Dr. Hensley stated that he did not have the authority to transfer Kambry; rather, that would be up to Dr. Fey. Dr. Hensley also said that this was not Dr. Fey's "first rodeo" and that Dr. Fey would be in to check Kambry after clinic, but if they needed him, he would be there sooner.

64.     Dr. Fey did not arrive until 4:50 p.m.

65.     Dr. Fey took one look at Kambry and stated, "That baby is anemic."

66.     At 5:00 p.m., a lab tech drew capillary blood for a complete blood count (CBC) after three failed attempts to draw a venous sample.

67.     After four attempts, Dr. Fey was finally able to establish an IV in Kambry's left foot at about 5:30 p.m.

68.     The CBC results were reported around 5:30 p.m. The CBC confirmed what was already apparent from Kambry's clinical presentation—she was severely anemic.

69.     Neither Dr. Fey nor anyone else at AllianceHealth Clinton recognized that Kambry was also hypovolemic.

70.     Dr. Fey decided to transfer Kambry to the NICU at OU Children's Hospital in Oklahoma City.

71.     Dr. Fey called OU to request a transfer and spoke to Lauren Comarda, D.O., a second-year neonatology fellow; and Kendra Riel, A.P.R.N., a NeoFlight nurse.

72.     Dr. Fey stated that he was worried about Kambry's brain because of the instrument use during delivery and that he thought she needed a head ultrasound that could not be performed at AllianceHealth Clinton.

73.     Dr. Comarda indicated that she was concerned about acidosis and asked if Dr. Fey had done a blood gas.

74.    Dr. Fey said that it had been difficult to establish an IV but that he would try to do a blood gas.

75.    Dr. Fey left Dr. Comarda and Nurse Riel with the impression that Kambry was stable on room air.

76.    Dr. Comarda agreed to accept the transfer and dispatched the NeoFlight team—Nurse Riel and Jamie Lewis, R.N.—to transport Kambry to OU Children's by helicopter.

77.    After the transfer call, at around 6:00 p.m., Dr. Fey left the hospital for nonemergency personal reasons.

78.    Dr. Fey did not tell the Allens that he was leaving.

79.    Dr. Fey did not attempt to get a blood gas, which would have shown that Kambry's tissues were not receiving adequate oxygen.

80.    Dr. Fey did not provide any treatment for Kambry's anemia.

81.    Before he left, Dr. Fey called the physician on call that weekend, Robert V. Blakeburn, M.D., and informed him that Kambry was stable and that the NeoFlight team would arrive soon.

82.    Dr. Fey left Kambry with Nurse Calloway and instructed Nurse Calloway to call the on-call physician if she needed anything.

83.    Nurse Calloway knew that Kambry was nowhere near stable when Dr. Fey left.

84.     At 6:15 p.m., the Chief Nursing Officer and Quality Director of AllianceHealth Clinton arrived in the nursery to assist with Kambry.

85.     At approximately 6:33 p.m., Nurse Calloway called Dr. Blakeburn and told him that he was needed in the nursery immediately.

86.     The OU NeoFlight team landed at AllianceHealth Clinton at 6:27 p.m. But the entry door was locked, and there was no gurney available to transport their heavy equipment.

87.     Nurse Lewis had to go to the other side of the hospital to gain entry and secure a gurney.

88.     Because of these logistical issues, Nurses Riel and Lewis did not arrive in the nursery until 6:45 p.m.

89.     Nurses Riel and Lewis found Kambry in significant respiratory distress with a "shocky" appearance. They were surprised because they were expecting a stable baby on room air.

90.     Nurses Lewis and Riel were also surprised that no physician was present given Kambry's condition.

91.     Nevertheless, the situation was consistent with Nurse Riel's experience with Dr. Fey and certain other physicians at AllianceHealth Clinton (not including Dr. Blakeburn).

92.     Specifically, in several years as a neonatal transport nurse, Nurse Riel responded to numerous calls for Dr. Fey's patients at

AllianceHealth Clinton, and Dr. Fey typically was not there when the transport team arrived. Instead, Dr. Fey relied on the hospital nursing staff to care for his patients after arranging for a transfer.

93.     Further, Dr. Fey and other physicians and staff at AllianceHealth Clinton often relied on OU transport nurses to stabilize neonatal patients. Nurse Riel responded to many calls at AllianceHealth Clinton where the patient should have been, but was not, stabilized before the transport team arrived.

94.     As soon as Nurses Riel and Lewis arrived in the nursery, Kambry's care was transferred to them.

95.     Nurses Riel and Lewis immediately began resuscitating Kambry in an effort to stabilize her for transfer.

96.     Dr. Blakeburn arrived a few minutes after Nurses Riel and Lewis. He assisted them as requested.

97.     Kambry went into cardiac arrest shortly after Nurses Riel and Lewis assumed her care.

98.     Although Nurses Riel and Lewis were able to restore spontaneous circulation, the first blood gas done at 7:30 p.m. revealed a profound metabolic acidosis that was incompatible with life.

99.     Nurses Riel and Lewis discussed Kambry's grave prognosis with the Allens, who elected to continue with all available treatment.

100.    Unfortunately, Kambry's condition did not improve, even after a transfusion.

101.    After consulting with Dr. Comarda and Clara H. Song, M.D., the faculty attending physician in the NICU at OU Children's Hospital, the Allens ultimately chose to hold Kambry instead of sending her to OU to be kept alive on machines for a short time (if at all).

102.    Dr. Blakeburn pronounced Kambry's death at 9:48 p.m.

103.    During Brittany's first postpartum appointment at Dr. Hensley's office, Dr. Hensley told the Allens that he had gone over the scenario time and time again in his head and could not figure out what happened to Kambry. He said that it was not a hard delivery, just "middle of the road," and that he had a more difficult delivery that morning.

104.    Dr. Hensley never told the Allens that he used a vacuum extractor and forceps during Kambry's delivery.

105.    At the recommendation of Nurse Riel, the Allens had an autopsy performed. That is how they learned what happened to Kambry's head.

106.    Kambry died from hypovolemic shock—i.e., she bled to death.

## General EMTALA Allegations

107.   Plaintiffs incorporate the allegations of the preceding paragraphs.

108.   EMTALA, the federal anti-dumping statute, imposes two primary obligations on hospitals that participate in the Medicare program and operate an emergency department: (1) to conduct an "appropriate medical screening examination" on an individual who presents for emergency treatment to determine whether the individual is suffering from an "emergency medical condition"; and (2) if the hospital determines that the individual has such a condition, to "stabilize" the condition before transferring him or her elsewhere. *See* 42 U.S.C. § 1395dd(a), (b)(1)(A), (e)(2).

109.   The duties imposed by EMTALA can only be carried out by physicians and other medical personnel in some way affiliated with the hospital. The hospital is responsible for the actions of these individuals, regardless of whether they are independent contractors or whether the hospital is subject to *respondeat superior* liability for their conduct under state law. In other words, independent-contractor physicians and other nonemployees responsible for EMTALA compliance are agents of the hospital for purposes of EMTALA, and any EMTALA violation by such an individual is a violation by the hospital.

110.   Under EMTALA, the hospital is charged with the knowledge of all of its physicians and other personnel.

111.   AllianceHealth Clinton is covered by EMTALA.

112.   Dr. Hensley, Dr. Knapp, Dr. Fey, and the AllianceHealth Clinton nursing staff and other personnel involved in Kambry's care were responsible for complying with EMTALA.

## Causes of Action

113.   Plaintiffs incorporate the allegations of the preceding paragraphs.

### Count I

**EMTALA – Failure to Provide Appropriate Medical Screening**
**42 U.S.C. § 1395dd(a)**
**(Defendant AllianceHealth Clinton)**

114.   Kambry presented to AllianceHealth Clinton for emergency treatment at the time of birth.

115.   Although Dr. Knapp allegedly "assessed" Kambry 15 minutes after birth, Dr. Knapp's examination was so paltry as to amount to no screening at all.

116.   Nurse Rivera and Nurse Calloway were not qualified to provide the required screening examination.

117.   Dr. Fey's examination nearly an hour and a half after Kambry's birth was so delayed as to amount to an effective denial of a screening.

118.   AllianceHealth Clinton failed to follow its standard screening procedures with respect to Kambry.

119.   Alternatively, AllianceHealth Clinton's standard screening procedures were so cursory that they were not designed to identify acute and severe systems that alert physicians of the need for immediate medical attention.

120.   AllianceHealth Clinton's violation of its duty to provide an appropriate medical screening was a direct cause of Kambry's injuries and death.

## Count II

### EMTALA – Failure to Stabilize
### 42 U.S.C. § 1395dd(b)(1)(A)
### (Defendant AllianceHealth Clinton)

121.   Kambry's anemia constituted an "emergency medical condition" within the meaning of 42 U.S.C. § 1395dd(e)(1)(A).

122.   AllianceHealth Clinton knew of Kambry's anemia.

123.   A transfusion was required to "stabilize" Kambry's condition within the meaning of 42 U.S.C. § 1395dd(e)(3)(A).

124.   AllianceHealth Clinton had the capacity to provide a transfusion for Kambry.

125.   AllianceHealth Clinton failed to provide a transfusion for Kambry before the OU NeoFlight team took over her care.

126.   AllianceHealth Clinton did not satisfy the requirements for transferring Kambry without stabilizing her condition. *See* 42 U.S.C. § 1395dd(b)(1)(B), (c).

127.   AllianceHealth Clinton's violation of its duty to stabilize was a direct cause of Kambry's injuries and death.

## Count III

**Wrongful Death**
**12 Okla. Stat. § 1053**
**(All Defendants)**

128.   Defendants owed a duty to exercise ordinary care and attention for Kambry.

129.   Defendant AllianceHealth Clinton breached its duty of care in at least the following ways: failing to provide adequate staff, failing to adequately train its staff, and failing to supervise the care rendered to Kambry by its nursing staff and other employees, agents, and ostensible agents.

130.   Additionally, Defendant AllianceHealth Clinton is liable for the acts and omissions of its nursing staff and other employees, agents, and ostensible agents under the doctrine of *respondeat superior*.

131.   Defendant Hensley breached his duty of care in at least the following ways: failing to deliver Kambry earlier in light of Brittany's severe gestational hypertension, using both a vacuum extractor and forceps to deliver Kambry during a C-section without appropriate medical justification, misusing the vacuum extractor and/or forceps, failing to examine Kambry, failing to recognize Kambry's critical condition at birth, failing to treat Kambry or transfer her for a higher level of care, and failing to adequately communicate with other healthcare providers regarding Kambry's condition and treatment.

132.   Defendant Women's Health Clinton is liable for the acts and omissions of Dr. Hensley under the doctrine of *respondeat superior*.

133.   Defendant Knapp breached her duty of care in at least the following ways: failing to perform a reasonable examination of Kambry, failing to document her examination of Kambry, failing to recognize and treat Kambry's anemia and hypovolemia, failing to transfer Kambry, and failing to adequately communicate with other healthcare providers regarding Kambry's condition and treatment.

134.   Defendant Fey breached his duty of care in at least the following ways: failing to timely examine Kambry, failing to transfer Kambry earlier, failing to treat Kambry's anemia, failing to recognize and treat Kambry's hypovolemia, abandoning Kambry and leaving her unattended by a qualified healthcare provider, and failing to adequately communicate with other healthcare providers regarding Kambry's condition and treatment.

135.   The negligent acts and omissions of Defendants described herein were direct causes of Kambry's injuries and death.

## Damages

136.   Plaintiffs incorporate the allegations of the preceding paragraphs.

137.   The damages available under EMTALA are the same as the damages available under Oklahoma's wrongful-death statutes. *See* 42 U.S.C. § 1395dd(d)(2)(A).

138.   As a result of the injuries sustained before her death, Kambry experienced conscious pain and suffering. *See* 12 Okla. Stat. § 1053(B).

139.   As a result of Kambry's injuries and death, Brittany and Chase have incurred medical and burial expenses and suffered grief, mental anguish, loss of anticipated services and support of Kambry, loss of

companionship and love of Kambry, destruction of the parent–child relationship, and loss of monies expended in support and maintenance of Kambry. *See* 12 Okla. Stat. §§ 1053(B), 1055.

140.   Because Defendants' conduct exhibited, at a minimum, reckless disregard for the health and safety of Kambry, Brittany and Chase are entitled to an award of punitive damages. *See* 12 Okla. Stat. § 1053(C); 23 Okla. Stat. § 9.1.

### Prayer for Relief

Plaintiffs demand judgment against Defendants for actual and punitive damages in excess of $75,000, interest, costs, and any other relief the Court deems just and proper.

June 7, 2019                        Respectfully submitted,

                                   THE BROOKS LAW FIRM

                                   /s/Michael L. Brooks
                                   Debra Ann Brooks, OBA No. 15093
                                   Michael L. Brooks, OBA No. 30021
                                   7100 N. Classen Blvd., Suite 300
                                   Oklahoma City, Oklahoma 73116
                                   Telephone: (405) 840-1066
                                   Facsimile: (405) 843-8446
                                   ann.brooks@brookslawok.com
                                   michael.brooks@brookslawok.com

                                   *Attorneys for Plaintiffs*

**Jury Trial Demanded**

**Attorney Lien Claimed**