IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRITTANY ALLEN, individually and as parent and next of kin of KAMBRY ALLEN, a deceased minor; and CHASE ALLEN, individually and as parent and next of kin of KAMBRY ALLEN, a deceased minor,<br><br>    Plaintiffs,<br><br>v.<br><br>CLINTON HMA LLC d/b/a ALLIANCEHEALTH CLINTON; MICHAEL C. HENSLEY, M.D.; and CLINTON HMPN, LLC, d/b/a ALLIANCEHEALTH MEDICAL GROUP WOMEN'S HEALTH CLINTON,<br><br>    Defendants. | Case No. CIV-19-00527-JD |

**ORDER**

Before the Court are the Motion for Partial Summary Judgment by Clinton HMA, LLC d/b/a AllianceHealth Clinton ("Hospital's Motion") [Doc. No. 126] and the Motion for Partial Summary Judgment by Brittany and Chase Allen, individually and as parents and next of kin of Kambry Allen, a deceased minor ("Allens' Motion") [Doc. No. 133]. After careful consideration, and for the reasons stated below, the Court grants the Hospital's Motion in part and denies the Allens' Motion in part on the remaining federal

claim. Because the Court declines to exercise supplemental jurisdiction over the state law claims against Defendants, the Court dismisses those claims without prejudice.[1]

I. **BACKGROUND**[2]

After in vitro fertilization treatment, Brittany and Chase Allen ("Allens") became pregnant with Kambry Allen ("Kambry") and selected Dr. Victor Fey as Kambry's primary-care physician. Dr. Michael Hensley delivered Kambry via C-section at Clinton HMA, LLC d/b/a AllianceHealth Clinton ("Hospital"). The parties dispute the extent of Kambry's medical difficulties immediately after birth, but Kambry was ultimately transferred to the Hospital nursery. Kambry was taken to the nursery by Nurse Reneé Calloway within 15 minutes of her birth. In the nursery, Nurse Calloway ran into Dr. Stacey Knapp. Dr. Knapp remained in the nursery with Nurse Calloway and Kambry for approximately 15 minutes and performed some degree of assessment on Kambry.

Around an hour and a half after birth, and after being alerted that Kambry may need additional care, Dr. Fey arrived in the nursery to examine her. Dr. Fey then made the decision to transfer Kambry to the NICU unit at the University of Oklahoma Children's Hospital in Oklahoma City ("OU"). OU agreed to the transfer and dispatched its NeoFlight team. Upon arrival, OU nurses had some difficulty entering the Hospital, but ultimately arrived at Kambry's bedside (a little over three hours after Kambry's birth). By this point, Kambry's condition had degraded to the point that she was not

---

[1] The Court uses CM/ECF page numbering from the top of filings in citations.

[2] The Court recounts only the facts relevant to its analysis and those needed to provide context.

stable enough to be transported from the Hospital to OU. She tragically died a few hours later.

The Allens sued the Hospital alleging that it violated the Emergency Medical Treatment and Labor Act ("EMTALA") because it failed to provide Kambry with an appropriate medical screening under 42 U.S.C. § 1395dd(a).[3] The Allens have also asserted wrongful death claims against Defendants under Oklahoma state law.

## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). A dispute about a material fact is genuine if a rational trier of fact could find in favor of the nonmoving party on the evidence presented. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 882 (10th Cir. 2018); *see also Anderson*, 477 U.S. at 248 (explaining a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

---

[3] Initially, the Allens also alleged the Hospital failed to stabilize Kambry prior to transferring her (42 U.S.C. § 1395dd(b)(1)(A)), but the Court dismissed this claim. [Doc. Nos. 19, 175].

In applying this standard, the Court "review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "When the parties file cross motions for summary judgment, '[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)). "'Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Id.* (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

### III. ANALYSIS

The Hospital argues that the Court should grant its Motion since its screening procedures were effectively followed in Kambry's situation. Conversely, the Allens argue that the Court should grant their Motion because regardless of which physician performed Kambry's screening, the screening was not an appropriate medical screening under EMTALA. Because the Court determines that Kambry received an appropriate medical screening under EMTALA, it assumes without deciding that she was entitled to one.

#### A. The Hospital did not violate EMTALA's screening requirement.

"Congress enacted [ ] EMTALA . . . to address 'the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency

4

conditions if the patient does not have medical insurance.'" *St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 692 (10th Cir. 2002) (quoting H.R. Rep. No. 99–241, pt. 1, at 27 (1985)). Under EMTALA, participating hospitals[4] have two primary obligations. "'First, the hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition.'" *Ward v. Lutheran Med. Ctr.*, 769 F. App'x 595, 599 (10th Cir. 2019) (unpublished) (quoting *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001)). "Second, if an emergency medical condition exists, the hospital must stabilize the patient before transfer or release." *Id.* The screening requirement, which is relevant here, is codified as follows:

> (a) Medical screening requirement
>
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

42 U.S.C. § 1395dd(a).

As evidenced by its text, the statute does not explicitly define what an "appropriate medical screening" is, but instead ties this term's meaning to the individual capabilities of the treating hospital. And, according to the Tenth Circuit, "a hospital defines which procedures are within its capabilities when it establishes a standard screening

---

[4] The parties do not dispute that the Hospital is a participating hospital under EMTALA.

5

policy . . . ." *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994). Therefore, courts are required to "give appropriate deference to the existing screening procedures utilized by the hospital, because it, not a reviewing court, is in a superior position to determine its own capabilities and limitations." *Phillips*, 244 F.3d at 797.

When analyzing whether EMTALA's screening requirement has been disregarded, "[a] court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." *Repp*, 43 F.3d at 522 n.4. "EMTALA's screening requirement is violated 'when it does not follow its own standard procedures.'" *Phillips*, 244 F.3d at 797 (quoting *Repp*, 43 F.3d at 522) ("'Disparate treatment' is simply another term for describing or measuring a hospital's duty to abide by its established procedures.").[5] "Of course, this standard does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA. Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy." *Repp*, 43 F.3d at 523.

---

[5] Under EMTALA, when a hospital fails to follow its own standard screening procedures with respect to a particular patient, the hospital has provided that patient with "disparate treatment" compared to other patients. For this reason, the Court does not need to rule on the Hospital's pending motion to strike Exhibit 1 of the Allens' response to the Hospital's supplemental brief before resolving the pending motions for summary judgment. [Doc. Nos. 200-1, 201]. Exhibit 1 details a screening received by a different Hospital patient, Mia Alonzo. But, as aptly stated by the Allens, "EMTALA does not require a comparison between the plaintiff's screening and the screenings actually provided to other specific patients. Rather, the comparison is between the plaintiff's screening and the screening that should be provided to every similarly situated patient under the hospital's standard procedures." [Doc. No. 200 at 2]. Therefore, "[Mia Alonzo's] screening is irrelevant under the correct legal standard." [Doc. No. 202 at 2]. *See also Phillips*, 244 F.3d at 797.

The Court must therefore determine (1) whether the Hospital had established screening procedures,[6] (2) what the Hospital's established screening procedures were, and (3) if those screening procedures were followed in this situation.

First, both parties agree that the Hospital has EMTALA screening procedures. *See* Pls.' Mot. [Doc. No. 133] at 21; Def.'s Mot. [Doc. No. 126] at 13. The Allens argue, however, that although "[the Hospital] has standard EMTALA screening procedures," it lacks "any standard procedure addressing the components of the exam." Pls.' Resp. [Doc. No. 156] at 26. They allege this is "equivalent to having no procedures at all and giving physicians unbridled discretion to screen however they want." *Id.* at 28. But the Court cannot ask whether the Hospital's procedures were *adequate*, only whether they were *followed*. The Tenth Circuit has explicitly rejected the argument that a hospital's standards can be so low as to amount to no appropriate medical screening. *Repp*, 43 F.3d at 522 n.4.[7] The Court must also do so here. Further, even without the parties' concessions, viewing the evidence in the light most favorable to the Allens for the

---

[6] *See Phillips*, 244 F.3d at 797 n.7 ("When a procedure has not been established by a participating hospital, the inquiry is somewhat different.").

[7] In support of this argument, the Allens note that, "Two patients presenting with identical symptoms could get completely different screenings—one might receive a drive-by visual examination, while the other might receive a thorough, hands-on assessment. Indeed, the hospital contends that Kambry received entirely disparate yet 'appropriate' screenings from Dr. Knapp and Dr. Fey." Pls.' Resp. [Doc. No. 156] at 28. However, if a doctor's screening followed established procedures but was substantively inadequate, the affected patient would have recourse via a medical malpractice claim— not EMTALA. *Cf. Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[Q]uestions related to the adequacy of a hospital's standard screening and diagnostic procedures must remain the exclusive province of local negligence law.").

Hospital's Motion and in the light most favorable to the Hospital for the Allens' Motion, no reasonable jury would find that the Hospital did not have an EMTALA screening procedure. Article 6 of the Hospital's Rules and Regulations explicitly addresses "emergency medical screening" and specifies that examination must be done by "qualified medical personnel, which shall be defined as a physician." *See* Def.'s Mot. Ex. 5 [Doc. No. 127].[8] Therefore, the Court concludes that the Hospital has established screening procedures.

Second, viewing the evidence in the light most favorable to the Allens for the Hospital's Motion and in the light most favorable to the Hospital for the Allens' Motion, the Court must ascertain what are the Hospital's screening procedures. The Hospital argues that its screening procedures only require that "a patient be provided with a medical screening examination to determine whether that individual is experiencing an emergency medical condition" and that this screening must "be performed by a physician." Def.'s Mot. [Doc. No. 126] at 13 (internal quotation marks and citation omitted). The Allens agree with the Hospital that those are part of its screening procedures, but they contend its screening procedures also require the physician to "arrive to do the screening within 30 minutes of being contacted" and "document the exam." Pls.' Mot. [Doc. No. 133] at 21. However, this dispute regarding whether the Hospital's screening procedures included these additional requirements is not material.

---

[8] In subsection 6.1(a)(3), it states that "in the case of a woman in labor, a registered nurse trained in obstetric nursing where permitted under State law and Hospital policy" can be "qualified medical personnel." However, this distinction is not relevant to the Court's analysis.

Because Dr. Knapp's assessment of Kambry took place within thirty minutes of Kambry's birth and since Dr. Knapp's failure to document the exam would be only a *de minimus* variation in the Hospital's procedure, resolution of this dispute is not "essential to the proper disposition of the claim." Therefore, the Court assumes without deciding that these additional requirements are part of the Hospital's screening procedures.

Article 6 of the Hospital's Rules and Regulations is titled "Emergency Medical Screening, Treatment, Transfer & On-Call Roster Policy." Def.'s Mot. Ex. 5 [Doc. No. 127]. Subsection 6.1(a), which is titled "Screening," states:

(1) Any individual who presents to the Emergency Department of this hospital for care shall be provided with a medical screening examination to determine whether that individual is experiencing an emergency medical condition. Generally, an "emergency medical condition" is defined as active labor or as a condition manifesting such symptoms that the absence of immediate medical attention is likely to cause serious dysfunction or impairment to bodily organ or function, or serious jeopardy to the health of the individual or unborn child.

(2) Examination and treatment of emergency medical conditions shall not be delayed in order to inquire about the individual's method of payment or insurance status, nor denied on account of the patient's inability to pay.

(3) All patients shall be examined by qualified medical personnel, which shall be defined as a physician or, in the case of a woman in labor, a registered nurse trained in obstetric nursing where permitted under State law and Hospital policy.

(4) Services available to Emergency Department patients shall include all ancillary services routinely available to the Emergency Department, even if not directly located in the department.

The parties agree that this section requires the screening to be conducted by a physician and that the physician must determine whether the patient is experiencing an emergency medical condition.

Third, viewing the evidence in the light most favorable to the Allens for the Hospital's Motion and in the light most favorable to the Hospital for the Allens' Motion, the Court analyzes whether the Hospital's procedures were followed. The Hospital argues that assessments Kambry received from Dr. Knapp and Dr. Fey satisfied EMTALA's "appropriate medical screening" requirement. The Allens argue that Dr. Knapp's assessment departed from the Hospital's procedures because she did not document the exam. For Dr. Fey, they argue his assessment departed from the Hospital's procedures because he did not conduct his assessment within thirty minutes of contact. Additionally, the Allens argue that "Dr. Knapp failed to perform critical components of what an appropriate medical screening examination would have been." Pls.' Mot. [Doc. No. 133] at 22. Because Dr. Knapp's assessment satisfied EMTALA's screening requirement, the Court does not reach the issue of whether Dr. Fey's assessment satisfied the requirement.

It is undisputed that Dr. Knapp was the on-call physician for pediatrics at the Hospital and that she assessed Kambry in some capacity within thirty minutes of Kambry's birth. However, the parties dispute whether Dr. Knapp provided Kambry with a medical screening examination that assessed whether Kambry was experiencing an emergency medical condition. The Hospital maintains she did, and the Allens argue that "Dr. Knapp did not attempt to perform a detailed enough assessment to rule out all types of emergencies, only the type of emergency that would require her to initiate an

10

immediate intervention such as intubation." Pls.' Mot. [Doc. No. 133] at 12. But a review of the evidence shows the Allens' contention is not a genuine dispute because no rational trier of fact could find in their favor.

    The relevant exchanges between the Allens' counsel and Dr. Knapp are as follows:

    Q: What did you mean when you said that "this baby might be in need"?

    A: Again, it was an evaluation of whether there was an emergency that required my intervention.

    Q: Okay. So you were doing an evaluation to see if there's any emergency that might need your intervention?

    A: Yes.
. . .
Q: And that's what . . . you were assessing whether or not it's an emergency?

    A: Yes.

    Q: And by "assessing," that means you're assessing the baby to see whether in your head, this baby is an emergency?
. . .
A: Yes.

    Q: And so you did a detailed-enough assessment to determine this wasn't an emergency?

    A: I did a -- it was enough to -- for me to be satisfied that there was no urgent intervention required on my part.
. . .
Q: Was your assessment detailed enough [] to rule out an emergency situation?

    A: My assessment was enough to allow me to be reassured that there was not anything that required my emergent intervention.
. . .
Q: Why not go through the medical records and see what this baby has experienced for the first 15 minutes of her life?

11

> A: I don't know whether the records were available to me or not. My role was simply to assist if this was an emergency or not . . . .
> . . .
> Q: Are you saying that you can assess whether or not this is an emergency without doing a full assessment?
>
> A: Yes, I can determine if there is a, an immediate, something that requires my immediate intervention.
>
> Q: Without doing a full assessment?
>
> A: Yes.

Def.'s Mot. Ex. 3 [Doc. No. 126-3]; Pls.' Mot. Ex. 17 [Doc. No. 133-17]. The only evidence the Allens offer to refute the above evidence that Dr. Knapp did indeed assess whether Kambry was experiencing an emergency condition are other portions of Dr. Knapp's testimony. For example, they cite to the below exchange:

> Q: In the nursery when you said you were assessing for an emergency, what emergency?
>
> A: Something that would require my immediate intervention.
>
> Q: Like what?
>
> A: Like a baby that needed to be intubated.
> . . .
> Q: Can anemia be a medical emergency for a baby?
>
> A: Can it be a medical emergency. Yes.
>
> Q: And did you do anything to rule in or rule out whether this baby that was pale or continued to be pale was anemic?
>
> A: I did not draw any lab.
>
> Q: And that's how you could tell?
>
> A: I think that's how you would confirm or make a diagnosis, unless you saw, obviously, bleeding.

Pls.' Mot. Ex. 17 [Doc. No. 133-17]. They also point to the fact Dr. Knapp "den[ied] having undertaken a full medical evaluation with history and physical." Pls.' Resp. Ex. 5 [Doc. No. 156-5]. But these statements do not support a finding that Dr. Knapp did not assess whether Kambry was experiencing an emergency medical condition. Dr. Knapp made clear she did not need to do a full medical evaluation to determine whether Kambry needed emergency aid. Dr. Knapp's statement that she was assessing for emergencies *like* if Kambry needed intubation does not mean she did not consider whether Kambry needed other emergency care as well. And, even if Kambry was anemic and Dr. Knapp mistakenly determined she did not need emergency medical care, this would be a misdiagnosis—not a failure to screen. *Cf. St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 694 (10th Cir. 2002) (recognizing that EMTALA is "not a federal medical malpractice law").

      The Allens highlight that Dr. Knapp said in her deposition that she did not perform Kambry's EMTALA screening. However, nothing in the statute or case law includes a *mens rea* requirement. "EMTALA looks only at the participating hospital's actions, not motives." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798 (10th Cir. 2001) (explaining that a hospital's bias towards certain patients is "irrelevant to whether [a patient] was treated in a manner consistent with [the hospital's] existing procedures"). Additionally here, the Hospital's procedures do not require the examining physician to intend to perform a patient's EMTALA screening. Thus, Dr. Knapp's intent or state of mind is not relevant as long as the Hospital's EMTALA procedures were followed. And here, they

13

were. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

In short, while the Allens offer much evidence suggesting Kambry was negligently treated and diagnosed, they point the Court to no evidence that contradicts Dr. Knapp's repeated testimony that she assessed Kambry to determine whether she was experiencing an emergency medical condition. A reasonable jury would conclude the same.

Both parties agree that Dr. Knapp did not document her assessment of Kambry, but they dispute whether documentation was necessary. The Court does not decide whether documenting this assessment was required because even if it was, Dr. Knapp's failure to do so was a *de minimus* departure from the Hospital's standard procedures. In *Repp v. Anadarko Municipal Hospital*, the Tenth Circuit held that the failure to take a complete medical history of the patient and ask him for a complete list of medications that he was taking was a *de minimus* variation of the hospital's procedure. 43 F.3d 519, 523 (10th Cir. 1994). Here, Dr. Knapp's failure to document her assessment is similarly minor. Had she documented her assessment, it would have explained that she evaluated whether Kambry was in need of emergency medical attention and concluded she was not. While there may be instances in which failure to document an assessment would be of significance, in this situation, it was not because documenting the assessment did not alter the assessment or affect the patient. So, Dr. Knapp's failure to document the assessment was a *de minimus*—or a slight—variation of the Hospital's procedure. "To hold otherwise would impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." *Repp*, 43 F.3d at 523.

The Court is saddened by the facts of this case. However, it cannot grant the Allens relief on their appropriate medical screening claim since EMTALA seeks "to eliminate patient-dumping and not to federalize medical malpractice." *Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 552 (10th Cir. 2000). Viewing the Hospital's Motion in the light most favorable to the Allens, and the Allens' Motion in the light most favorable to the Hospital, the Court concludes there is no genuine dispute as to any material facts and the Hospital is entitled to judgment as a matter of law on the EMTALA screening claim.

### B.     The Court declines to exercise jurisdiction over the Allens' remaining state law claims.

"[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). "'When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.'" *Gaston v. Ploeger*, 297 F. App'x 738, 741 (10th Cir. 2008) (unpublished) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir. 1998)). The Tenth Circuit has "repeatedly recognized that this is the preferred practice." *Id.* at 746. However, district courts should exercise their discretion to try state claims "in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

Although the pretrial proceedings before this Court have been extensive, the Court does not think judicial economy, convenience, and fairness would be served by retaining jurisdiction in this case.[9] Since "[n]otions of comity and federalism demand that a state court try its own lawsuits[] absent compelling reasons to the contrary" and the Court finds no compelling reasons here, it dismisses the remaining claims without prejudice. *Thatcher Enters.*, 902 F.2d at 1478.

## IV.   CONCLUSION

Consequently, the Court GRANTS the Hospital's Motion [Doc. No. 126] in part and DENIES the Allens' Motion [Doc. No. 133] in part. In light of the Court's ruling on the federal EMTALA screening claim, the Court dismisses the state law claims without prejudice. Although other pending motions exist, the Court's rulings in this Order are dispositive of the remaining issues. A judgment will separately follow.

IT IS SO ORDERED this 8th day of March 2024.

*[signature]*
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[9] The Court asked for supplemental briefing on this issue so it would have the information necessary to analyze these factors. One of the Court's inquiries included whether the Allens would be able to reassert their state law claims in state court. The Defendants' joint response [Doc. No. 199] chided the Court for seeking counsels' arguments on this issue and stated that "[w]hether [the Allens] are allowed to refile their case in state court is simply not a proper consideration for this federal court." However, Defendants ignore the fact that, under *Thatcher Enterprises*, the Court must consider fairness. Therefore, whether a meritorious claim discretionarily dismissed by this Court is able to be refiled *is* a proper consideration.